764 N.W.2d 398 (2009)
277 Neb. 641
OMNI BEHAVIORAL HEALTH, a Nebraska corporation, on behalf of itself and all of its clients, et al., Appellants,
v.
NEBRASKA FOSTER CARE REVIEW BOARD, an administrative agency of the State of Nebraska, et al., Appellees.
No. S-08-332.
Supreme Court of Nebraska.
April 23, 2009.
*401 William G. Dittrick and Jennifer D. Tricker, of Baird Holm, L.L.P., Omaha, and Morgan P. Kelly, for appellants.
Jon Bruning, Attorney General, and Frederick J. Coffman, Lincoln, for appellees.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
A provision of Nebraska's Foster Care Review Act[1] authorizes the State Foster Care Review Board (the State Board) to visit and observe foster care facilities to ascertain whether they are meeting the needs of foster children. OMNI Behavioral Health (OMNI) and David and Wendy Krom operate foster care facilities in Nebraska. They brought this action for declaratory and injunctive relief, contending that warrantless home visits pursuant to the act would violate their constitutional rights, because the State Board has not promulgated rules restricting the time, scope, and manner of such visits. OMNI also alleged that Carolyn K. Stitt, executive director of the State Board, wrongfully interfered with its contractual relationship with the State of Nebraska. OMNI, its president William Reay, and the Kroms (collectively appellants) appeal from an order of the district court for Lancaster County denying the relief sought and entering summary judgment in favor of the State Board, Stitt, and Burrell Williams, a former chairman of the State Board (collectively appellees). We affirm the judgment of the district court.

BACKGROUND

PARTIES
OMNI is a Nebraska nonprofit corporation, and Reay is its president and one of its founders. OMNI operates four "enhanced treatment group homes" in Nebraska which provide therapeutic foster care for children with significant mental disorders and behavioral problems who pose a risk to themselves and others. The group homes are licensed by the State of Nebraska as community mental health centers and foster care providers, and are *402 approved for participation in the Medicaid program. Each group home accommodates approximately 10 children who range in age from 12 to 18. Most, but not all, of the children residing in OMNI's group homes have been placed in the custody of the Nebraska Department of Health and Human Services (DHHS) pursuant to court orders. As to these children, OMNI is compensated either with Medicaid funds or, where a child does not qualify for Medicaid, through individual contracts with DHHS. Pursuant to a contract with DHHS, OMNI provides initial training, 24-hour support, and ongoing training to licensed foster parents who care for children in their private residences.
The State Board is established pursuant to the Foster Care Review Act and includes 11 members appointed by the Governor with the approval of the Legislature.[2] The State Board is required by statute to establish local foster care review boards for the review of cases of children in foster care placement[3] and to refer such cases to the local boards for review.[4]
The State Board is required by law to establish and maintain a statewide register of all foster care placements occurring within the state based upon reports made by DHHS, courts, and child-placing agencies.[5] The State Board is required to review the activities of local boards and report findings to DHHS, county welfare offices, and courts having authority to make foster care placements.[6] The State Board also has statutory responsibility with respect to permanency planning for children in foster care. It is required to review the case of each child at least once every 6 months and submit to the court having jurisdiction over the child
its findings and recommendations regarding the efforts and progress made to carry out the plan or permanency plan established pursuant to section 43-1312 together with any other recommendations it chooses to make regarding the child. The findings and recommendations shall include whether there is a need for continued out-of-home placement, whether the current placement is safe and appropriate, the specific reasons for the findings and recommendations, including factors, opinions, and rationale considered in its review, whether the grounds for termination of parental rights under section 43-292 appear to exist, and the date of the next review by the [S]tate [B]oard or designated local board.[7]
At the center of the dispute in this case is the following provision of the Foster Care Review Act: "The [S]tate [B]oard may visit and observe foster care facilities in order to ascertain whether the individual physical, psychological, and sociological needs of each foster child are being met."[8]

CLAIMS
This action involves two distinct claims. First, appellants contend that because the State Board has not promulgated rules and regulations narrowing the scope of its statutory authority to visit and observe foster care facilities, any such visits to appellants' facilities would violate their rights under the 4th and 14th Amendments to the U.S. Constitution and article I, § 7, of the Nebraska Constitution. *403 Second, OMNI alleges that in 2004, Stitt tortiously interfered with its contractual relationship with the State of Nebraska. Appellants sought declaratory and injunctive relief prohibiting the State Board from visiting "any group homes or foster care facilities" until it "promulgates constitutionally acceptable and sufficient rules and regulations surrounding the time, scope and manner of its warrantless searches." Finally, appellants further sought to enjoin appellees from "contacting any law enforcement, judicial, or state and/or federal monetary funding payors, including, but not limited to the Governor of the State of Nebraska and [DHHS], in attempts to defame OMNI and to preclude funding to OMNI or placement of children in OMNI facilities." Appellees denied these claims and asserted several affirmative defenses.

PROCEEDINGS IN DISTRICT COURT
After conducting an evidentiary hearing, the district court denied appellants' motion for a temporary injunction. Appellees then filed a motion for summary judgment. At a hearing on this motion, the parties offered and the court received all of the testimony and some of the exhibits received at the hearing on the motion for temporary injunction. This record reflects a long-standing dispute between OMNI and the State Board regarding the scope of the State Board's statutory authority to monitor OMNI's operations. The dispute has generated a 1998 Attorney General's opinion[9] recognizing the State Board's authority under § 43-1303 to conduct both announced and unannounced visits of foster care facilities, including group homes operated by OMNI and others. The dispute has also generated a 2006 letter from the office of Public Counsel (ombudsman) critical of the fact that the State Board has not promulgated rules and regulations addressing the timing, scope, and nature of visits conducted pursuant to § 43-1303. Although the parties' differences are extensive and complicated, the material facts relevant to the issues presented in this appeal are relatively straightforward.
The rules and regulations promulgated by the State Board pursuant to the Administrative Procedure Act[10] include no provisions pertaining to visits conducted pursuant to § 43-1303. A draft version of rules pertaining to this subject was prepared and discussed in 2006 but never adopted by the State Board, for reasons which are unclear from the record. The State Board does have certain written protocols and manuals pertaining to home visits, some of which are available on its Web site, but these have not been adopted as regulations and do not place specific restrictions on home visits.
A representative of the State Board, together with a representative of DHHS acting at the request of the Governor, conducted an unannounced visit to an OMNI group home in 1999. The State Board has not attempted another unannounced visit to an OMNI group home since that time, and OMNI has denied the State Board's requests to conduct announced visits. The State Board has not conducted any unannounced visits to any foster care facilities since 2001.
The Kroms have been licensed foster care providers since 2000. They have cared for a total of 6 or 7 foster children in their private home and were caring for two foster children at the time of Wendy Krom's testimony in 2007. The Kroms have received training and support from OMNI. In 2005, a representative of the *404 State Board called Wendy Krom to arrange a home visit. OMNI had instructed foster care providers to refuse to allow the State Board to inspect foster care facilities, so the Kroms reported the request to their OMNI specialist. The State Board eventually obtained a court order requiring the Kroms to permit the visit.
The visit was conducted by two representatives of the State Board, and an OMNI specialist was also present. The visitors explained the purpose of their visit and asked the Kroms basic questions about their foster children. They also spoke with the children and gave them gifts. There is no indication in the record that they inspected the Kroms' home. The visit was approximately 20 minutes in duration. Wendy Krom described the visitors as "very polite" and compared the visit to "grandma and grandpa coming over." She later completed a foster home visit evaluation in which she stated that she was impressed with the professionalism and demeanor of the persons who conducted the visit and considered them to be "excellent" representatives of the State Board. However, Wendy Krom testified that she would not feel comfortable denying a future request for a home visit by the State Board due to fear of the foster children's being removed from her home, and she believes that there should be rules governing such visits.
At the time of the 2007 evidentiary hearing in this case, the State Board, in conjunction with its local boards, was conducting 25 or fewer visits of foster care facilities per year. The visits are arranged in advance and last 40 minutes or less. Some are informational visits to group homes and other foster care facilities which are not located in private homes. During such visits, the facility and programs are examined in order to determine whether the foster placement is safe and appropriate, but the foster children residing at the facility are not interviewed or otherwise evaluated. State Board representatives enter only those areas of a group home or similar facility where permitted by the facility staff. The State Board has never been denied permission to visit any group home or similar facility by any foster care provider other than OMNI.
"Project Permanency" visits are conducted by the State Board at private foster homes to determine that children are safe and their needs are being met. Arrangements for the visit are made in advance with the foster parents. During "Project Permanency" visits, the foster parents are interviewed but the children are not. Representatives of the State Board enter only those rooms to which they are invited by the foster parents. The State Board has not received complaints regarding any "Project Permanency" visit.
Other home visits conducted by the State Board are pursuant to court orders entered in juvenile proceedings. There has been no reported harm to any foster child resulting from a visit by the State Board.
Stitt wrote a letter to the director of DHHS on August 19, 2004, setting forth details of a "consistent pattern of children's safety being endangered in OMNI group homes" and a failure on the part of OMNI to acknowledge and address such problems. Reay disputed these statements in a letter to the State Board dated August 23, 2004. The State Board denies receiving this letter. OMNI's general counsel sent a letter dated September 1, 2004, addressed to Stitt in her individual capacity and as executive director of the State Board, alleging that Stitt's August 19 letter to the director of DHHS was libelous and requesting that Stitt publish "retractions and corrections." The record *405 does not reflect whether Stitt responded to this letter. Reay testified in an April 2007 hearing that none of OMNI's facilities have been closed as a result of any action by the State Board, that its operations in Nebraska have expanded, and that it continues to receive new state contracts.
Based upon this evidence, the district court entered an order on February 28, 2008, granting appellees' motion for summary judgment. The court determined that the visits by the State Board pursuant to § 43-1303 did not constitute "`warrantless administrative searches'" implicating Fourth Amendment rights, but, rather, were "in furtherance of the responsibility of the state to assure appropriate care and services for children who are in the state's care." The court also determined that this action was an impermissible collateral attack on juvenile court orders requiring that foster care facilities be available for announced as well as unannounced visits by case managers, court-appointed special advocates, guardians ad litem, and the State Board. The court determined that appellants lacked standing to assert any rights on behalf of others. Finally, the court rejected OMNI's claim that the actions of Stitt or the State Board tortiously interfered with OMNI's contractual relationship with the State, reasoning that one state agency cannot interfere with a contract between another state agency and a third party and that there was no prayer for relief for tort damages.
Appellants perfected a timely appeal from the district court's order. We moved the appeal to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[11]

ASSIGNMENTS OF ERROR
Appellants assign that the district court erred in (1) sustaining appellees' motion for summary judgment; (2) finding that the State Board visits do not constitute warrantless administrative searches; (3) applying the "special needs" balancing test to the facts of this case in an improper manner; (4) essentially finding that because of the contract between OMNI and DHHS, the 4th and 14th Amendment rights of OMNI and the children in its care have been extinguished or somehow diminished; (5) finding that appellants are attempting to collaterally challenge the jurisdiction of certain Nebraska juvenile court judges; (6) dismissing the claims against Stitt in her individual capacity; and (7) determining that they do not have standing to bring this action on behalf of the children in their care.

STANDARD OF REVIEW
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[12] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[13]

*406 ANALYSIS

FOURTH AMENDMENT CLAIMS
The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable search and seizure.[14] These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.[15] While the language of the Fourth Amendment specifically protects the right of a person to be secure in his or her person, house, papers, and effects against unreasonable searches and seizures,[16] the U.S. Supreme Court has held that the protection of the Fourth Amendment is applicable to commercial premises, as well as to private homes.[17] The existence of an interest protected by the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution depends upon whether the person or entity claiming the interest has a legitimate or justifiable expectation of privacy in the place which the government seeks to enter.[18]
In this case, appellants do not seek relief with respect to any specific visit conducted pursuant to § 43-1303(3) in the past. Instead, they seek declaratory and injunctive relief based on the broad assertion that "the current lack of regulations surrounding [State Board] `visits' violates the 4th and 14th Amendment rights of every individual subject to the [State Board] `visits.'"[19] We agree with the district court that OMNI and the Kroms have standing to assert this claim only with respect to the premises upon which they provide foster care and that Reay has no legal interest in this case separate from that of OMNI.
Appellants contend that the constitutionality of foster home visits pursuant to § 43-1303 should be determined under the "Colonnade/Biswell doctrine,"[20] as articulated by the U.S. Supreme Court in New York v. Burger.[21] The doctrine is based upon a recognition that because there is a reduced expectation of privacy on the part of an owner of commercial premises in a "`closely regulated'" industry, the warrant and probable cause requirements of traditional Fourth Amendment jurisprudence have lessened application.[22] In Colonnade Corp. v. United States,[23] which involved a warrantless inspection of a business which sold liquor pursuant to a federal revenue statute, the court noted that the liquor industry had long been subject to close government supervision and inspection. In United States v. Biswell,[24] the Court upheld a warrantless search of a licensed gun dealer's premises pursuant to a federal statute, noting that when the dealer *407 chose to engage in the highly regulated firearms business, he did so with the knowledge that his business would be subject to effective inspection. In New York v. Burger, the Court upheld a warrantless inspection of a vehicle-dismantling business, articulating a three-part test for a constitutionally permissible inspection in the context of a "pervasively regulated business":
First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made....
Second, the warrantless inspections must be "necessary to further [the] regulatory scheme."...
Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provide[e] a constitutionally adequate substitute for a warrant."... In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.[25]
Appellants argue that because there are no regulations defining the scope of home visits pursuant to § 43-1303(3) or limiting the discretion of the State Board in conducting such visits, any home visit pursuant to the statute would violate their Fourth Amendment rights under the Colonnade/Biswell doctrine.
We agree with the district court that the Colonnade/Biswell doctrine is not the appropriate standard for determining whether home visits by the State Board violate the Fourth Amendment rights of foster care providers. The reasonable expectation of privacy of a person or firm who is paid to provide foster care for children who are wards of the State is far more attenuated, as to the place where such care is provided, than that of a regulated seller of firearms, liquor, or motor vehicle parts. The State, as the legal custodian of such children, has an obligation to see that they are receiving proper care, and foster care providers have an obligation to the children and the State to provide such care. The Legislature has empowered the State Board and its designated local boards with oversight responsibilities regarding foster care placements, including specific authority to conduct home visits. On this record, it is uncertain whether such visits would constitute a search or seizure within the meaning of the Fourth Amendment or article I, § 7, of the Nebraska Constitution. The visit is not for the purpose of law enforcement, and the record indicates that in the past, the State Board has complied with restrictions on visits imposed by foster care providers.[26]
To the extent constitutional rights may be implicated by home visits to foster care facilities pursuant to § 43-1303(3), we agree with the district court that the visits should be judged under a general standard of reasonableness which courts have applied when "`special [governmental] needs,'" beyond the normal need for law enforcement, justify a departure from the requirements of individualized suspicion, warrants, and probable cause under traditional Fourth Amendment analysis.[27] This *408 standard has been applied in cases involving drug testing of railroad workers involved in accidents,[28] U.S. Customs Service employees seeking promotion to sensitive positions,[29] and high school students participating in sports.[30] It is based upon a recognition that "the legitimacy of certain privacy expectations vis-a-vis the State may depend upon the individual's legal relationship with the State."[31] In such cases, the Supreme Court has applied a balancing test which weighs the intrusion on an individual's liberty interest against the special governmental need for the intrusion.[32]
In Wyman v. James,[33] the U.S. Supreme Court applied this general test of reasonableness to the question of whether a recipient of government benefits for her children could refuse a home visit by a caseworker without risking the termination of benefits. After first questioning whether such visit constituted a search in the context of the Fourth Amendment, the Court concluded that even if it did, it was not unreasonable. In reaching this conclusion, the Court considered a number of factors, including the statutory and regulatory prohibition of forcible entry or entry under false pretenses, visitation outside working hours, and "snooping in the home."[34] Other factors considered by the Court included the public interest in the welfare of the child and expenditure of public funds, the giving of advance notice of the visit, the importance of observing the child at the actual place of residence, and the fact that the visit was not conducted by police or uniformed authorities, and was not related to any criminal investigation. In concluding that no issue of "constitutional magnitude" was presented, the Court noted that the parent had the right to refuse the home visit, with the only consequence being the cessation of public assistance.[35]
Here, the State has a special need to visit foster care facilities arising from its obligation to see that children entrusted to its legal custody are receiving proper and appropriate foster care from those who contract to provide such care. Thus, we conclude that any claim that a home visit by the State Board infringes upon Fourth Amendment rights, or corresponding rights under the Nebraska Constitution, must be judged by a standard of reasonableness, taking into consideration all relevant circumstances. Normally, this would be an issue of fact which would preclude summary judgment.[36] However, as we have noted, appellants in this case do not challenge the constitutionality of any specific home visit conducted in the past. Rather, they allege that in the absence of duly promulgated regulations defining the time, place, and scope of home visits, *409 any such visit would necessarily violate their rights even if the "special needs" standard is applied.
We reject this contention. The Foster Care Review Act permits but does not require the State Board to promulgate regulations.[37] The absence of specific regulations governing home visits is one factor that a court could consider in determining whether a specific visit was constitutionally unreasonable, but is not the exclusive or necessarily the dispositive factor. For example, the absence of regulations defining the permissible scope and circumstances of home visits might be entitled to significant weight in determining the reasonableness of an unannounced visit conducted in the middle of the night without logical justification, but considerably less weight in the circumstance where the date, time, and scope of a daytime visit are discussed in advance by the State Board and the foster care provider. In other words, the absence of specific regulations governing home visits may or may not result in a particular visit's being held unreasonable and therefore unconstitutional, depending upon all of the other pertinent facts and circumstances. The fact that OMNI group homes house children with mental disorders and behavioral problems, including some who are not wards of the State, does not alter this analysis. It is simply one of the relevant factors which a court would need to consider in determining whether or not a particular home visit was reasonable.
For these reasons, we conclude that the district court did not err in entering summary judgment with respect to appellants' claims for injunctive relief on constitutional grounds. Because of this disposition, we need not reach appellants' related assignments of error.

TORT CLAIM
Appellants contend that the district court erred in dismissing their claims against Stitt in her individual capacity. We note that OMNI is the only one of the appellants to have asserted a claim against Stitt individually, alleging that she made various misstatements and mischaracterizations directed to the Governor "which constitute[ed] an intentional act done for the purpose of causing harm" to OMNI's relationship with the State of Nebraska and that "OMNI suffered damage based upon Stitt's interference" with that relationship. To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[38]
The only specific communication between Stitt and the Governor alleged by OMNI and reflected in the record is her August 19, 2004, letter to the director of DHHS, which bears the notation "cc: Governor Johanns." The letter was written on Stitt's letterhead as executive director of the State Board and signed by her in that capacity. In the opening sentence of the letter, Stitt stated that she was writing at the request of the State Board. In their complaint, appellants alleged that Stitt "at all times relevant hereto, has been the Executive Director of the [State Board], and as such has been and will continue to *410 act `under color of state law.'" Although OMNI's request for a retraction of statements made in the letter was directed to Stitt "simultaneously in both [her] individual and in [her] official capacities," this does not support an inference that Stitt ever communicated with the Governor regarding OMNI other than in her official capacity. Although OMNI alleged in the complaint that it "suffered damage based upon Stitt's interference with its relationship with the State of Nebraska," Reay testified that no OMNI facility has been closed as a result of any action of the State Board and that OMNI continues to receive new state contracts. Reay also made a conclusory statement that OMNI's reputation had been harmed, but he did not relate this to any specific conduct on the part of Stitt in her individual capacity or to OMNI's contractual relationship with the State of Nebraska.
The evidence received in support of the motion for summary judgment shows that Stitt did not, as a matter of law, wrongfully interfere in her individual capacity with any contractual relationship between OMNI and the State of Nebraska, and the district court did not err in entering summary judgment with respect to this claim.

CONCLUSION
For the reasons discussed, we affirm the judgment of the district court.
AFFIRMED.
HEAVICAN, C.J., not participating.
NOTES
[1] See Neb.Rev.Stat. §§ 43-1301 to 43-1318 (Reissue 2008).
[2] § 43-1302(b).
[3] § 43-1304.
[4] § 43-1306.
[5] See § 43-1303(1).
[6] See § 43-1303(2) and (3).
[7] § 43-1308(1)(b).
[8] § 43-1303(3).
[9] Att'y. Gen. Op. No. 98029 (July 13, 1998).
[10] Neb.Rev.Stat. §§ 84-902 to 84-909 (Reissue 2008).
[11] See Neb.Rev.Stat. § 24-1106(3) (Reissue 2008).
[12] State ex rel. Wagner v. Gilbane Bldg. Co., 276 Neb. 686, 757 N.W.2d 194 (2008).
[13] Id.
[14] State v. Bakewell, 273 Neb. 372, 730 N.W.2d 335 (2007).
[15] See State v. Roberts, 261 Neb. 403, 623 N.W.2d 298 (2001).
[16] State v. Sinsel, 249 Neb. 369, 543 N.W.2d 457 (1996).
[17] New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).
[18] See State v. Lara, 258 Neb. 996, 607 N.W.2d 487 (2000).
[19] Brief for appellants at 13.
[20] See, United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).
[21] New York v. Burger, supra note 17.
[22] Id., 482 U.S. at 702, 107 S.Ct. 2636.
[23] Colonnade Corp. v. United States, supra note 20.
[24] United States v. Biswell, supra note 20.
[25] New York v. Burger, supra note 17, 482 U.S. at 702-03, 107 S.Ct. 2636.
[26] See Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).
[27] See, Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); Nat. Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).
[28] Skinner v. Railway Labor Executives' Assn., supra note 27.
[29] Treasury Employees v. Von Raab, supra note 27.
[30] Vernonia School Dist. 47J v. Acton, supra note 27.
[31] Id., 515 U.S. at 654, 115 S.Ct. 2386. Accord S.L. v. Whitburn, 67 F.3d 1299 (7th Cir. 1995).
[32] See Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001).
[33] Wyman v. James, supra note 26.
[34] Id., 400 U.S. at 321, 91 S.Ct. 381.
[35] Id., 400 U.S. at 324, 91 S.Ct. 381.
[36] See O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).
[37] See § 43-1303(2).
[38] Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008).