MILLER CHEMICAL COMPANY, INC., A NEBRASKA
CORPORATION, APPELLANT, V. ROBERT TAMS ET AL.,
APPELLEES.

320 N.W.2d 759

Filed June 11, 1982. No. 44156.

Donald J. Buresh of Swarr, May, Smith & Andersen, for appellant.

Alan M. Wood, for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

WHITE, J.

This is an action by the plaintiff-appellant, Miller Chemical Company, against the defendants-appellees, Robert Tams and Barbara Tams, for intentionally interfering with Miller's customer relations in southeast Nebraska by reproducing and mailing anonymously to those customers price discount information which Miller had sent to its customers in its southeast Iowa trade area. The case was tried to the District Court sitting without a jury. At the close of the plaintiff's evidence the District Court ruled that there had been no showing of any intentional act on the part of the defendants Tams to interfere with the business of the plaintiff, other than competitive acts, and further that there had been no breach or termination of a seller or buyer relation-

ship between the plaintiff and any of its customers. The District Court also ruled that the damages were too speculative. On February 17, 1981, the District Court overruled plaintiff's motion for new trial and the plaintiff appealed. We affirm.

The plaintiff distributes agricultural chemicals and animal health feed additives for livestock and crops. The company distributes its products in southeast Nebraska, southwest Iowa, northwest Missouri, and northeast Kansas. These areas make up one of Miller's trade areas. Another such trade area comprises approximately 25 counties in southeast Iowa.

In February 1979 Tom Henderson, a Miller salesman in the southeast Iowa territory, abruptly resigned his position. Henderson went to work for a competitor of Miller, Lane Agri Supply. The owner of Lane Agri Supply was also an ex-Miller salesman. The company feared lost sales in that area. To encourage its customers in that trade area to continue business with them, Miller sent out the letter requesting its customers in that area to buy a 60- to 90-day supply of its products. Miller offered the customers price discounts of 5 percent on its products if they bought a 60- to 90-day supply.

Approximately 1 week after the letter was sent, Miller learned that its customers outside the southeast Iowa territory had also received the letter. Several customers in southeast Nebraska and northeast Kansas were asking for more details about the 5 percent discount. It was later learned that Robert Tams, a former Miller salesman then in competition with Miller, had also received a copy of the letter. Tams testified that when he received a copy of the discount letter, he became irritated and upset with it. He sent a copy of the letter to approximately 10 or 15 Miller customers in the southeast Nebraska trade area. Tams testified that his reason for sending the letter out was because those customers had

contacted him about the short supply of OTC and CTC, two of the products Miller was directing to the southeast Iowa trade area.

After customers in Miller's southeast Nebraska trade area learned about the discounts offered in the southeast Iowa trade area, Miller instigated a discount program in the southeast Nebraska trade area also. As a result of extending these discounts to the southeast Nebraska trade area, Miller granted discounts totaling $6,035 on products originally only discounted for customers in southeast Iowa. Also as a result of extending the discounts to southeast Nebraska, Miller was forced to pay its salesman his regular commission on the products sold. This resulted in an additional cost of $800. Further, because the products known as OTC and CTC were in short supply, Miller purchased additional supplies resulting in further costs of $950. Larry Hoffman, employee and general manager for Miller, testified that additional management time, costing $1,200, was devoted to extending the discount. The total amount of cost to Miller for extending the discounts to the southeast Nebraska trade territory totaled $8,985.

Two Miller customers from the southeast Nebraska trade area testified that they had received copies of the letter giving discounts to customers in the southeast Iowa territory. Neither customer knew who sent the letter to them, and testified that their business relationship had not ceased with Miller.

The standard of review in this court of a law action is that a judgment of the District Court will not be set aside by this court on appeal unless it is clearly wrong and not supported by the evidence. *Town & Country Realty of Kearney, Inc. v. Glidden,* 204 Neb. 820, 285 N.W.2d 828 (1979); *Crawford v. Ham,* 209 Neb. 802, 311 N.W.2d 896 (1981).

In determining whether the evidence supports the findings of the trial court in an action at law where

a jury has been waived, the evidence must be considered in the light most favorable to the successful party. All conflicts must be resolved in his favor, and he is entitled to the benefit of every inference that can reasonably be deduced from the evidence. *Aurora Cooperative Elevator Co. v. Larson,* 204 Neb. 755, 285 N.W.2d 498 (1979); *Gehrke v. General Theatre Corp.,* 207 Neb. 301, 298 N.W.2d 773 (1980); *Crawford v. Ham, supra.*

Several jurisdictions have decided cases in the interference with business relationships area. Most of the cases this court has decided in this area have dealt with civil conspiracy cases. See, *Diesel Service, Inc. v. Accessory Sales, Inc.,* 210 Neb. 797, 317 N.W.2d 719 (1982); *Dixon v. Reconciliation, Inc.,* 206 Neb. 45, 291 N.W.2d 230 (1980). The essential elements of tortious interference with business relationships are: (1) The existence of a valid business relationship or expectancy; (2) Knowledge by the interferer of the relationship or expectancy; (3) An intentional act of interference on the part of the interferer; (4) Proof that the interference caused the harm sustained; and (5) Damage to the party whose relationship or expectancy was disrupted. See, 45 Am. Jur. 2d *Interference* § 50 (1969); 5 A.L.R.4th 9 (1981); *Ulan v. Vend-A-Coin, Inc.,* 27 Ariz. App. 713, 558 P.2d 741 (1976).

This court stated in dicta in *Delay First Nat. Bank & Trust Co. v. Jacobson Appliance Co.,* 196 Neb. 398, 410-11, 243 N.W.2d 745, 752 (1976): "One of the basic elements of tortious interference with a business relationship requires an intentional interference inducing or causing a breach or termination of the relationship or expectancy."

The evidence shows that Robert Tams was a competitor of Miller. During the trial Tams testified that he had received anonymously in the mail a copy of the discount letter Miller had sent to its customers in the southeast Iowa trade area. Tams stated that

prior to receiving the letter he had been contacted by several Miller customers inquiring whether he had any CTC or OTC. At that time CTC and OTC were in short supply in the southeast Nebraska area. After receiving Miller's letter, Tams stated that he sent copies to those Miller customers in the southeast Nebraska trade area that had inquired about the short supply of CTC and OTC so that they would know why it was in such short supply. Tams circled the following portion of the letter: "All of you are probably aware of the critical short supply of chlortetracycline and oxytetracycline. EFFECTIVE IMMEDIATELY ALL Miller Chemical production of our label CTC 50, CTC 10, Oxy 50, Oxy 10 will be TOTALLY available to customers in the previously mentioned Iowa counties and Missouri . . . AND THE 5% DISCOUNT APPLIES. However, the same stipulation on our ability to ship as of 5:00 p.m. March 7, 1979 as indicated above holds true here too. WE WILL attempt to divert our total production of CTC and Oxy to you for an UNLIMITED time (hopefully through March 30th)."

The Restatement of Torts § 768 at 71 (1939) recognizes the privilege of a competitor and provides: "(1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest, in his competition with the other."

The Comment on subsection (1) states in part at 72: "One's privilege to engage in business and to compete with others . . . implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to

hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert custom[ers] from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.''

Tams' actions fall within the area of privilege. The fact that he sent the letter out only to those Miller customers who contacted him about the short supply of CTC and OTC supports this position. This also indicates that his contact was not directed solely to spite or ill will. The fact that hatred or desire for revenge was part of the reason is insufficient to make interference improper if the conduct is directed at least in part to advancement of his own competitive interest and social benefits arising therefrom. See Restatement (Second) of Torts § 768, Comment on Clause (d) (1979).

We conclude that the action was justified and was competitive in nature. The business relationship between Miller and its customers is strictly an "at will" relationship. There is no evidence of any contract in the record. Further, there is no evidence that any customers had ceased doing business with Miller. Miller was forced to allow the discount in the southeast Nebraska trade area because of the competitive pressure put on it by Tams. This court refuses to grant Miller any type of monopoly or to protect it from any type of free competition in this area. The judgment of the trial court was correct and is therefore affirmed.

AFFIRMED.